**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Case No. 26-cr-94 (JEB)** |
| **v.** | **:** | |
| | **:** | |
| **MATTHEW THOMAS KENT, et al.,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

**GOVERNMENT'S OMNIBUS MEMORANDUM**
**IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion for detention pending trial for the following defendants: Matthew Thomas Kent, Colton Keet Huthsing, and Joshua Glen Taylor.

By virtue of the offenses alleged in Counts One, Three, Four and Five of the Indictment, there is a rebuttable presumption that no conditions or combinations of conditions can effectively ensure the defendants' appearances in this case and otherwise protect the community, pursuant to 18 U.S.C. § 3142(e)(3)(A). Additionally, for Kent, there is a separate rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(B), as his alleged ongoing conduct in Count One, as well as the specific conduct alleged in Counts Four and Five of the Indictment, all occurred while he was on release pending trial.

The United States submits that detention is appropriate for each defendant pursuant to 18 U.S.C. §§ 3142(f)(1)(B) (offense with maximum sentence of life imprisonment) and 3142(f)(1)(C) (serious drug felony). The United States also requests detention as to each defendant pursuant to 18 U.S.C. § 3142(f)(2)(A) (risk of flight).

## APPLICABLE LAW

Each defendant is subject to detention pursuant to 18 U.S.C. § 3142(f)(1)(C) because he is charged with a serious drug felony. Pursuant to 18 U.S.C. § 3142(e)(3)(A), there exists a rebuttable presumption that no conditions or combinations of conditions can effectively ensure each defendant's appearance in this case and otherwise protect the community.

If a defendant has been indicted for "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act[,]" the Court must presume, subject to rebuttal, that there is no condition or combination of conditions that will reasonably assure the defendant's appearance as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(A). The indictment, standing alone, constitutes probable cause that the person charged committed the offense and is "enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community." *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *accord United States v. Williams*, 811 F. Supp. 2d 274, 276 n.2 and 277 (D.D.C. 2011) (Kollar-Kotelly, J.) (citing *Smith* and *United States v. Carter*, 802 F. Supp. 2d 180, 182 (D.D.C. 2011) (Lamberth, C.J.)). Relying on the legislative history of this provision, the United States Court of Appeals for the District of Columbia Circuit has observed that the rebuttable presumption covering serious drug trafficking offenses was included because of the "significant risk of pretrial recidivism" among persons charged with major drug felonies. *United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (citing S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203)). When the rebuttable presumption of 18 U.S.C. § 3142(e) is triggered, it operates "at a minimum to impose a burden of production on the Defendant to offer some credible evidence contrary to the statutory presumption." *Id.* at 371.

2

The government must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). For a detention decision based upon risk of flight, the government only need prove by a preponderance of the evidence that there are no conditions or combinations of conditions that will assure the defendant's appearance as required. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986). Furthermore, the government may present evidence by way of a proffer at a detention hearing. *Smith*, 79 F.3d at 1209-10.

In considering whether there are conditions of release, which will reasonably assure the safety of any other person and the community, and the appearance of the defendant as required, the Court should consider and weigh the following factors as to each defendant: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his or her history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). In consideration of these factors, along with the applicable rebuttable presumption, the United States respectfully submits that the defendants' release poses an unmitigable risk to the community's safety, and that additionally, their release would not assurance their appearance at future proceedings, nor compliance with any conditions of release fashioned by the Court.

## SUMMARY OF INVESTIGATION

This case involves a sprawling and prolonged drug distribution conspiracy, spanning multiple states and countries, that involves enormous quantities of multiple controlled substances. The evidence against each defendant—gathered from extensive communications, drug shipment seizures, search warrants, and controlled purchases and deliveries gathered by law enforcement over at least two years—is substantial. All eleven defendants have been deeply involved in the

charged conspiracy to distribute kilogram quantities of high-purity methamphetamine, gamma-butyrolactone ("GBL"), and other controlled substances throughout the United States, including the District of Columbia. All eleven defendants are very experienced drug traffickers whose vocation was to peddle some of the most dangerous drugs in our city and country.

Based on the charged offenses, each of the above-captioned defendants faces a rebuttable presumption that no conditions or combinations thereof can effectively ensure the defendants' appearance in this case and otherwise protect the community, pursuant to 18 U.S.C. § 3142(e)(3)(A).

The reason for the penalties and rebuttable presumption is clear. Methamphetamine is a highly potent and dangerous drug that can cause severe physical and psychological damage and death, even with short-term use. It is classified as a Schedule II controlled substance due to its extreme potential for addiction and limited medical use. Research from the United States Centers for Disease Control and Prevention (CDC) shows that methamphetamine is the second most commonly found drug in people who fatally overdose, after synthetic (lab-made) opioids. https://nida.nih.gov/research-topics/methamphetamine. According to the CDC, overdose deaths involving methamphetamine have surged in the United States, reaching over 95,000 deaths in the United States in the 3.5-year period ending in June 2024. https://www.cdc.gov/mmwr/volumes/74/wr/mm7432a1.htm

GBL is a list I chemical under the Controlled Substances Act. According to the DEA, its licit uses include use as "an industrial chemical intermediate and solvent, which is found in paint removers, cleaners, adhesives, and nail polish removers." *See* DEA, Gamma-Butyrolactone, https://www.deadiversion.usdoj.gov/drug_chem_info/gbl.pdf. However, if intended for human consumption, as in this case, it is a schedule I controlled substance pursuant to 21 U.S.C. §§

802(32) and 813. There is evidence that after oral ingestion, GBL is converted to GHB via the metabolic process in the human body. GHB is a schedule I depressant and can be used as a "date rape" drug. *See* https://www.dea.gov/sites/default/files/2020-06/GHB-2020_0.pdf. GBL/GHB is very addictive, and overdose can result in unconsciousness, seizures, slowed heart rate, severe respiratory depression, decreased body temperature, vomiting, nausea, coma, or death. It has a very narrow safety margin, where a small increase in dosage can lead to life-threatening complications. The substance can cause breathing to slow significantly or stop entirely. It has a high mortality risk. *Id.*; *see also* https://pmc.ncbi.nlm.nih.gov/articles/PMC10698855/; https://pmc.ncbi.nlm.nih.gov/articles/PMC7837237/#j_aiht-2020-71-3314_ref_015.

In this case, the danger is heightened because the defendants distributed both methamphetamine and GBL to be consumed simultaneously by the end users. Mixing these drugs is highly dangerous and creates significant health risks. This combination is considered to be one of the most lethal and unpredictable drug pairings commonly seen today. *See, e.g.,* https://www.drugs.ie/drugs_info/about_drugs/poly_drug_use1/.

### FACTUAL AND PROCEDURAL BACKGROUND

As described below, the defendants are among a group of individuals that have been identified as members of a multi-jurisdictional drug trafficking organization operating throughout the United States. Over the course of this investigation, law enforcement efforts have identified a multi-layered distribution structure, with a variety of controlled dangerous substances originating from large-source suppliers located in several locations around the United States and South Korea and subsequently redistributed through a network of identified co-conspirators operating in New York City, Philadelphia, Baltimore, Miami, Washington, D.C., and elsewhere.

Through a coordinated effort across multiple federal law enforcement agencies, including

5

the Drug Enforcement Administration ("DEA"), Internal Revenue Service Criminal Investigations ("IRS-CI"), the United States Postal Inspection Service ("USPIS"), Customs and Border Protection ("CBP"), and Homeland Security Investigations ("HSI"), it was determined that the defendants, together with additional co-conspirators identified by law enforcement throughout the course of this investigation, have conspired to import drugs into the United States from South Korea, and traffic and distribute methamphetamine, GBL, and other controlled substances within the United States, including the District of Columbia, the Mid-Atlantic United States, New York, Illinois, California, Pennsylvania, and Florida. The GBL trafficked by members of the conspiracy, along with the methamphetamine, was intended to be used for human consumption.

To date law enforcement efforts have utilized a variety of investigative techniques, to include undercover operations, search warrants, confidential sources, physical surveillance, analysis of records, review of electronic communications, and partnership with local and state law enforcement agencies. As part of this investigation, law enforcement has seized over 30 kilograms of high purity methamphetamine, approximately 800 kilograms of GBL, many kilograms of other controlled substances, and hundreds of thousands of dollars in U.S. Currency. This does not include over 1000 kilograms of GBL seized in South Korea in September 2025 as part of this investigation, which is the largest domestic seizure of a controlled substance ever recorded in South Korea.

On April 23, 2026, a federal Grand Jury sitting in the District of Columbia returned an Indictment charging the above-captioned defendants with numerous felony offenses, as follows:

6

| Count | Defendant(s) | Approx. Date(s) of Offense | Charge |
|---|---|---|---|
| 1 | Kent, Huthsing, Acosta, Defendants 1, 2, and 6, Taylor, Fitch, Spitzer, Morgan, and Archer | Jan. 2023 - Present | 21 U.S.C. 841(a)(1), (b)(1)(A)(viii), (b)(1)(C), and 846 |
| 2 | Defendant #6, Spitzer, Morgan | Jan. 2024-May 2025 | 18 U.S.C. 1956(h) |
| 3 | Kent | June 13, 2024 | 21 U.S.C. 841(a)(1), (b)(1)(A)(viii) |
| 4 | Kent | April 23, 2025 | 21 U.S.C. 841(a)(1), (b)(1)(A)(viii) |
| 5 | Kent | July 9, 2025 | 21 U.S.C. 841(a)(1), (b)(1)(A)(viii) |

All the defendants have been charged with offenses for which they are facing mandatory minimum sentences of incarceration of 10 years and up to life.

On April 29, 2026, a coordinated search and arrest operation was conducted in connection with this indictment. Approximately fifteen residences were searched across eight judicial districts in the Eastern United States. The chart below illustrates additional recoveries made by law enforcement beyond the above-detailed seizures made over the course of the conspiracy:

| ADDRESS and/or VEHICLE | ASSOCIATIONS and/or DEFENDANTS PRESENT | EVIDENCE SEIZED[1] |
|---|---|---|
| 702 2nd Street NW, Apartment 264, Washington, DC<br><br>Audi A-8 sedan (positive K-9 alert, search pending) | Hutshing | • 109.5 grams of methamphetamine<br>• 2.69 kilograms of GBL<br>• 191.9 grams of ketamine<br>• Drug paraphernalia, including packaging materials and scales<br>• Approximately $250,000 in redeemable MGM National Harbor bet slips |
| 1424 Q Street NW, Washington DC | Acosta | • Approximately 280 grams of methamphetamine (total) |

[1] Unless otherwise noted, all weights for narcotics in this chart include packaging. Additionally, unless otherwise noted, when a particular substance is identified as a specific narcotic, this reflects the results of field testing and all results are considered preliminary pending final testing from the DEA Mid-Atlantic Laboratory.

| | | |
|---|---|---|
| | | • Methamphetamine packaged into various baggies, including varying-sized Ziploc bags. |
| 4815 N Capitol Street NE, Apartment 10, Washington, DC | Taylor | • Multiple Ziploc bags containing methamphetamine residue |
| 3950 West Terre Parkway, Shortpump, VA | Taylor | • 1/4 kilogram of methamphetamine<br>• 1/2 ounce of fentanyl powder |
| 525 W 28th St, Apt 1060, New York, NY | Spitzer | • 608.6 grams of methamphetamine<br>• 2.6 kilograms of GBL<br>• 947.4 grams of pills (pending laboratory testing)<br>• 248.4 grams of powder (pending laboratory testing)<br>• 511.1 grams of Psilocybin mushrooms<br>• Various scales and packaging material |
| 605 W 42nd St, Apt 58B, New York, NY | Morgan | • 2.6 kilograms of methamphetamine<br>• 11.2 kilograms of GBL<br>• 271.2 grams of pills (pending laboratory testing)<br>• 670.1 grams of powder (pending laboratory testing)<br>• Various scales and packaging material |
| Philadelphia, PA | UCC-1 | • 3.65 kilograms of methamphetamine<br>• 2.6 kilograms of GBL<br>• 164 grams of heroin<br>• 242 grams of powder (pending laboratory testing)<br>• 2 firearms |
| New York, NY | UCC-2 | • 56.6 kilograms of ketamine (powder, crystalline and liquid form)<br>• Approximately $100,000 in U.S. currency |
| Washington, DC | UCC-3 | • 86 grams of methamphetamine |

| | | • 370.6 grams of GBL |
|---|---|---|
| Alexandria, VA | UCC-4 | • 132 grams of methamphetamine<br>• 40 grams of amphetamine pills<br>• 226 grams of cocaine |
| Miami, FL | UCC-5 | • 1.5 gallons of GBL<br>• 1.5 kilograms of brown powder (pending laboratory testing) |

## THE CONSPIRACY

From at least January 2023 through at least April 2026, the defendants participated in a large-scale, multi-state and international drug trafficking conspiracy responsible for the distribution of kilogram quantities of high-purity methamphetamine and GBL throughout the United States, including the District of Columbia. The conspiracy operated with a division of labor: upstream suppliers sourced narcotics; regional distributors received, stored, and repackaged those narcotics, and downstream distributors sold them to customers while collecting and concealing proceeds. Upstream suppliers of methamphetamine and GBL supplied their co-conspirators such as defendants Matthew Kent, Colton Huthsing, Kenneth Archer, Robert Fitch, Michael Spitzer, Scott Morgan, and Defendant #6. Kent, Huthsing, and Defendant #6 acquired approximately two pounds of methamphetamine at a time, and sometimes much more. These shipments were at times on a weekly basis. The upstream suppliers would also acquire methamphetamine from Defendant #6 when needed.

With respect to GBL, the upstream suppliers supplied GBL to Kent, Huthsing, Defendant #6, Fitch, Spitzer, Morgan and others. Defendant #6 then supplied GBL to Joshua Taylor and Joshua Taylor supplied pound quantities of methamphetamine to Defendant #6 when needed.

Defendant Kent and Defendant #6, along with upstream suppliers, maintained and shared control of storage units in D.C., Baltimore, and other locations, to store bulk quantities of GBL

9

and methamphetamine to be readily available for redistribution purposes. The upstream suppliers delivered large quantities of methamphetamine and GBL to the storage units so Kent and Defendant #6 could then distribute them to their redistributors.

The organization was very sophisticated. Its members used encrypted applications, coded language, commercial parcel services, stash locations, and shell business entities to facilitate and conceal its operations. Members of the conspiracy accepted payments through peer-to-peer platforms and deposited those funds into business accounts, using the accounts to disguise drug proceeds as legitimate income. The defendants were integral participants in a tightly coordinated network responsible for the large-scale distribution of dangerous narcotics.

At the center of the conspiracy, narcotics were sourced in bulk quantities and shipped to co-conspirators in New York, Washington D.C., and other locations, where they were stored and redistributed to customers and sub-distributors. Members of the conspiracy used commercial parcel services, including UPS and USPS, to ship kilogram quantities of methamphetamine across state lines, coordinating shipments through encrypted applications.

Law enforcement recovered narcotics from multiple locations used by members of the conspiracy, including residences, hotel rooms, and storage units. Members of the conspiracy conducted repeated transactions with the same customers, maintained running balances for drug debts, and coordinated deliveries using coded language referring to quantities and drug types.

GBL was imported in liquid form through international shipments that were falsely declared as consumer products, including cleaning solutions and beauty supplies. These shipments were intercepted on multiple occasions upon arrival into the United States, confirming the conspiracy's ongoing use of international supply lines. Methamphetamine, by contrast, was

distributed domestically in pound quantities and consistently tested at exceptionally high purity levels, with nearly all seizures to date exceeding 90% purity.

Payments for narcotics were made through peer-to-peer platforms, including Apple Pay, Cash App and Zelle, as well as in cash. Members of the conspiracy tracked those payments through ledgers and, in some instances, routed funds through business accounts to conceal that the money represented drug proceeds.

1. **Matthew Thomas Kent**

Matthew Thomas Kent operated as a primary distributor in the District of Columbia. He stored, packaged, and distributed methamphetamine from locations in Northeast Washington, D.C., and coordinated transactions using encrypted communications.

a. **Co-conspirator Communications**

During the course of the investigation, investigators recovered electronic messages from co-conspirator phones, including from phones seized from Kent. These communications establish that Kent was acquiring multi-pound quantities of methamphetamine and kilogram quantities of GBL for redistribution over the course of this investigation. As an example, in a text conversation on January 28, 2025, an upstream supplier and Defendant #6 discussed Matthew Kent and acquiring approximately 10 pounds of "dry," a common reference for methamphetamine:

**Defendant #6**: [I]f Matt [Kent] paid u for dry I should deduct the 1700 since it was double paid.

**Upstream Supplier**: Matt never paid me anything. You took a dry from me and paid that. Ok. Are you grabbing the 10 dry off of [Upstream Supplier's Partner] or just 9 of them. You haven't paid for any of the dry. 19,000 for the dry?

11

**Defendant #6**: 9 he needs one for himself which is fine I only need 7 but will be out and then need more till totally quit dry so getting 2 extra is logical choice.

A few minutes later, on January 28, 2025, the Upstream Supplier and Defendant #6 discussed the purchase of the 9 pounds of methamphetamine and "wet," a common reference to GBL, and identify defendant Kenneth Archer as a redistributor of methamphetamine:

**Upstream Supplier**: Ok. How you paying for the 9 dry and 2 wet=20k?

**Defendant #6**: Hey *** quick question. What was names of your two clients that got busted in fl please only cause II directly occasional supply Florida on dry via mail  I said I'm stopping but if names are same I'll likely halt this shipment for safety.

**Upstream Supplier**: Kenneth archer.

As another example of Matt Kent's acquisition of methamphetamine, On January 21, 2025, Upstream Suppliers discuss Kent's acquisition of 5 pounds of methamphetamine and GBL:

**Upstream Supplier**:  Matt [Kent] is getting 5lbs so wanted to get the cash for us. . . . I have the 8L for his client. But will have no more after that. I will have him, Jimmie, Michael [Spitzer] or Scotty [Scott Morgan, aka Scotty Rox] come to your place and grab 10 more liters for me. Quick question, did you grab any liters from the office? How did you fulfill Danny's order?  Matt is getting 5 pounds and will give me the $$ before I leave [here].

The following day, on January 22, 2025, the Upstream Suppliers discussed "Getting the 9500 from Matt now."  In a subsequent message the Upstream Suppliers state, "Also, Colton [Huthsing] paid the business $500 for part of the dry payment Matt owed for the 5lbs, which I Zelled from chase business account to my boa business acct. Since I paid for the dry."

On May 18, 2025, Kent messaged an Upstream Supplier to discuss the redistribution of GBL ("he has it, but he needs 5 more of yours") with the supplier responding, "How mich does he

sell a liter for?" and "That's were [Defendant #6] got his? Obviously lol." Kent responded, "800 to [Defendant #6] because of me But 1200-14—to normies."

On or about June 6, 2025, an Upstream Supplier messaged Kent about storage units containing current product supplies ("okay it was 19 that should be in the storage unit then, unless u grabbed them?"). In a subsequent message to Kent, the Upstream Supplier said "these I'm referring about…" followed by a photo of approximately 24 clear bottles containing a liquid substance suspected to be GBL. The Supplier then messaged Kent, "of course you weren't gonna come by! Oh well, I'm so over this life! And caring about f'in losers!" Kent then responded, "I'll be there in an hour," and "I have to collect this cash in queens." Kent ultimately responded to the picture sent from the Supplier of the 24 bottles with a text stating "I haven't been to DC in 3 weeks."

Additional evidence of Kent's involvement in the conspiracy was revealed following a review of the extraction of Kent's phone seized from Kent by law enforcement at Union Station in July 2025, further discussed *infra*. As an example, during a review of Kent's phone, investigators identified a shared note belonging to Kent that was shared with defendant Colton Huthsing that is a drug ledger and guide on what "code words" to use when describing certain narcotics Kent and Huthsing are trafficking.



The above shared note reflects common code words and references utilized by the members of this conspiracy, including "dry" and "t" for methamphetamine, and "water," "wet," and other words or symbols (like droplets) that connote liquid for GBL for human consumption. Kent also states at the bottom of the note on the right, that "Javier," a suspected co-conspirator, "is my dry guy now and good friend but he can't supply me in the speed and quantity that I need most of the time." The note also indicates what is believed to be references to other drugs distributed by Kent and Huthsing: "X pill" for ecstasy and "fish" for cocaine (high quality cocaine resembles the sheen of fish scales). In a text message on March 27, 2025, Defendant #6 told Kent that "I need a lb of fish or kilos (pound or kilo of cocaine) for a customer . . ."

14

In another example, in a text message on June 23, 2025, Kent advised an associate that Kent "had given Javier every penny to get dry and he delayed delivery for 12 days . . .." These examples further establish that Kent is a high-level trafficker of methamphetamine, GBL and many other drugs.

### b. Kent Arrests and Seizures in This Conspiracy

Matthew Kent was arrested in March 2024, in Anne Arundel County. Kent was discovered asleep and in a manner of undress inside of his vehicle.  This eventually resulted in Anne Arundel County Police arresting Kent and conducting a search of the vehicle, which revealed approximately 480 grams of methamphetamine and packaging material.

On or about June 13, 2024, members of the U.S. Park Police ("USPP") and the Federal Bureau of Investigation ("FBI") executed a search warrant at Kent's residence at 1213 18th Street NW, Unit B, Washington, D.C. Kent was found inside as the sole occupant. Recovered from the living room on top of an ottoman was a clear crystal substance in a multicolored dish and a clear Ziplock baggie containing a clear crystal substance of suspected methamphetamines weighing approximately 28 grams. Recovered from underneath the same ottoman were multiple clear plastic Ziploc baggies, all containing a clear crystal substance of suspected methamphetamines weighing approximately 88 grams. Additionally recovered from underneath the ottoman was a black and brown colored "coach" bag. Recovered from within this bag were multiple clear plastic Ziploc baggies, all containing a clear crystal substance of suspected methamphetamine weighing approximately 130 grams, a clear plastic Ziploc baggie containing thirteen (13) white round pills imprinted with "85" and "I", and a black digital scale with residue. Then, in the bedroom, all within a red bag, a Glock 9mm handgun, magazine, and 14 rounds of ammunition were recovered. Laboratory analysis confirmed that the methamphetamine had a net weight of 210 grams and

exceeded 90% purity. Kent was indicted in the Superior Court of D.C. for Possession with Intent to Distribute Methamphetamine and related firearm offenses. As of the date of this submission, that case remains pending. The methamphetamine seized on this date has been charged as Count Three in the Indictment in this case.

Kent continued his trafficking activity after his arrest, the seizure and his indictment in the Superior Court case. In addition to his drug trafficking that is evidenced in the electronic messages discussed above, on April 23, 2025, he directed a controlled purchase of approximately 221 grams of methamphetamine in the District of Columbia, providing instructions for both the location of the narcotics and the placement of payment. Kent advised a confidential source, CS-1, that the methamphetamine would be outside of 1213 18th Street NE (the same residence Kent was arrested at in July 2024), in a box next to the front door of the residence. Kent directed CS-1 to leave the money inside of the cinder block wall that leads down to the steps to the door of Unit B. CS-1 retrieved the methamphetamine and left the money as directed by Kent. A DEA chemist determined that the substance was methamphetamine with a net weight of approximately 221 grams and purity of 98%.

In July 2025, law enforcement had electronic communications from Kent evidencing that he would be traveling to Philadelphia to obtain additional methamphetamine. When Kent returned to Washington, D.C., on July 9, 2025, investigators surveilled him at Union Station in coordination with Amtrak police.



Investigators observed Kent exit the southbound Northeast Regional Amtrak train that had arrived at Union Station carrying two bags, one duffel bag and one cross-body bag. Kent was surveilled from the platform out to the front of Union Station where he entered an unidentified vehicle. The vehicle traveled to a nearby apartment complex in Northeast Washington, D.C., later identified as Station House, where defendant Colton Huthsing resides, and parked in a garage.

Soon thereafter, Kent exited the apartment complex on foot and was surveilled to the Union Station Metro platform. Investigators conducted a consensual encounter with Kent. Kent disclaimed ownership of the bags that were observed in his possession and stated that he had found both bags at the Union Station metro station. Investigators seized both bags and utilized a K9 to conduct an open-air sniff on them. Investigators also seized Kent's phone. The bags (and phone) were searched on July 25, 2025, pursuant to a search warrant authorized by Judge Sharbaugh. Approximately 400 grams of methamphetamine were seized, with a purity of 97% according to the DEA Mid-Atlantic Laboratory.

17

### 2. Colton Keet Huthsing

As detailed *supra*, Huthsing was identified by law enforcement as an associate of Kent's in Summer 2025. Huthsing operated as a distributor and organizer within the conspiracy, particularly in the District of Columbia. Evidence shows that he coordinated with other members to obtain and distribute methamphetamine and GBL, maintained drug ledgers, and directed subordinate participants. Law enforcement recovered evidence linking Huthsing to shipments of GBL disguised as consumer products, including parcels containing multiple kilograms of GBL seized at U.S. airports. Additional evidence from a related search warrant execution tied to Huthsing's operations resulted in the recovery of more than one kilogram of methamphetamine and other narcotics. The evidence demonstrates Huthsing's active role in sustaining and expanding the conspiracy's distribution network.

Based upon forensic examination of seized digital devices over the course of this conspiracy, as well as other investigative techniques, Huthsing has been determined to play two roles in this conspiracy: (i) he coordinates and directs other members of this conspiracy in the acquisition and redistribution of narcotics; and (ii) since the September 2025 seizure and arrests conducted in Seoul, South Korea, Huthsing has attempted to fill the void left in the U.S.-based GBL market by incorporating a shell corporation and importing bulk quantities of GBL from abroad for redistribution in the United States.

While investigators determined that Kent traveled to Huthsing's Station House apartment in July 2025 upon his return from Philadelphia, additional investigative measures revealed that Kent worked as a subordinate to Huthsing within the narcotics trafficking conspiracy. For example, in messages obtained from a forensic extraction of Kent's device, investigators were able to

determine that Kent (in green messages below) served as a representative for Huthsing ("Colton") in "meetings."



Kent is not the only member of this conspiracy who served as Huthsing's subordinate. On January 31, 2026, Customs and Border Protection (CBP) at John F. Kennedy International Airport in New York found a package from the United Kingdom destined for an address in Washington, D.C. That package contained 300 small vials each purporting to contain 10 grams of "eyelash extension liquid remover." A field test of some of the contents also revealed GBL. The recipient of that package was listed as "CKH Services LLC"[2] "Robert Dunlap." Googling CKH Services

---

[2] The "CKH Services" shell company name follows the nomenclature of other shell companies incorporated over the course of the conspiracy for the purpose of importing GBL from abroad.

LLC returned a result from Bizapedia[3] for that entity, which lists the registered agent as Colton K. Huthsing, whose address is 701 2nd Street, NE, Unit 509, Washington, D.C. 20002.

On February 11, 2026, in connection with the interdicted shipment from JFK, HSI agents executed a search warrant at Dunlap's apartment in Northwest D.C., where they found approximately 1.14 kilograms of suspected methamphetamine, 241 grams of suspected cocaine, 106.8 grams of suspected amphetamine, 92.2 grams of suspected mephedrone (a Schedule I synthetic stimulant), and 324 grams of ketamine. Dunlap was publicly indicted in District of Columbia Case No. 26-cr-29 (EGS) for possession with the intent to distribute 50 grams or more of methamphetamine (actual) and a mixture and substance containing a detectable amount of cocaine. On February 25, 2026, Dunlap was ordered detained by the Honorable Matthew J. Sharbaugh, and he remains detained pending trial.

During the search of Dunlap's residence, a shipping label with Huthsing's name and address on it was located by law enforcement. The shipper on that label is listed as Quality Beauty Store Ltd., which is the same shipper that sent GBL to Dunlap's apartment, resulting in the aforementioned controlled delivery and search warrant. The label discovered in Dunlap's apartment is shown below:

---

[3] There is no entry for CKH Services, LLC in the D.C. Licensing and Consumer Protection's DCRA SCOUT database.



Much like Kent, prior to his arrest and pre-trial detention, Dunlap openly referred to Huthsing as "his boss." Specifically, in late-2025, when negotiating a sale of "T" (crystal meth), Dunlap (in blue) showed sophistication when dealing with his customer (in green), and also directed that the drug money be sent via peer-to-peer payment to Huthsing, whom Dunlap called "his boss."



From: +18262030993 Bob Dizzle

Prefer not as we will be outside and that qualifies  it as a controlled buy

Priority: Normal

Platform:

12/21/2025 4:22:00 AM(UTC+0)

From: +18262030993 Bob Dizzle

Zelle to this business account;
Ckh.services.llc@gmail.com

Priority: Normal

Platform:

12/21/2025 4:23:32 AM(UTC+0)

From: +18262030993 Bob Dizzle

It's my boss's business account

Priority: Normal

Platform:

12/21/2025 4:24:02 AM(UTC+0)

Only three days after the search of Dunlap's residence, on February 14, 2026, CBP at JFK targeted a Parcelforce World parcel destined for Huthsing's Station House apartment for possible narcotics. The shipper was identified as a hotel in London, United Kingdom with the intended recipient being listed as Huthsing. Upon examination of the shipment, there were five bottles of "Indusclean" premium cleaner all containing a clear liquid. The clear liquid was tested utilizing a TruNarc and produced a positive result for the presence of GBL. The five bottles of "Indusclean" bottles had a combined weight of 6.07 kilograms.





This same shipper, the Thistle Hotel in London, also sent a similarly manifested parcel to Dunlap on or about the same day the parcel addressed to Huthsing's Station House address was interdicted. This similarly manifested parcel sent to Dunlap was seized by CBP JFK on February

8, 2026, based on the parcel containing 4.82 kilograms of suspected GBL (based on a field test) manifested as "soap" in four bottles of Indusclean premium cleaner. A picture showing the seizure made by CBP sent to Dunlap is shown below, with near-identical bottles as those sent to Huthsing.



Despite Dunlap's public arrest and pre-trial detention, Huthsing continued to traffic until his arrest in connection with the instant indictment. On April 24, 2026, law enforcement conducted physical surveillance at Taylor's residence at 4815 North Capitol Street, NE, in anticipation of the coordinated arrest operation on April 29. During surveillance, law enforcement observed Huthsing (wearing a blue polo) exit Taylor's residence and walk towards his vehicle, a black Audi A8,[4] with Taylor (wearing a black tank top).[5]

---

[4] On April 29, 2026, during the search and arrest operation conducted at Huthsing's residence detailed *infra*, law enforcement officers were able to locate Huthsing's Audi A8 in the parking garage of the Station House building. A drug-sniffing canine alerted on the vehicle, and on May 1, 2026, the Honorable Moxila A. Upadhyaya authorized the search of Huthsing's vehicle in Case No. 26-sw-131. The search of Huthsing's vehicle is anticipated to occur on May 4, 2026.

[5] Cell-site location monitoring corroborated Taylor and Huthsing's location at Taylor's residence.



On April 29, 2026, a search of Huthsing's Station House apartment carried significant indicia of large-scale drug trafficking. In addition to the physical recoveries detailed in the summary chart presented *supra*, other items found in his residence suggested sophistication and his elevated role in the conspiracy. Numerous flight tickets were recovered indicating international travel to various destinations in Europe and elsewhere, including Switzerland. Additionally, amongst other items such as packaging materials, law enforcement recovered a money counter in a storage area of the residence, depicted below, as well as several digital scales and other indicia of trafficking.





Notably, Huthsing kept detailed records of his day-to-day business, excerpted in the photograph below. Beyond typical ledgers often utilized by drug traffickers, based upon the notes recovered by law enforcement, Huthsing appears to have kept a near-daily accounting of his drug

26

trafficking business. This is significant for purposes of detention, as it underscores the significant amount of business conducted by Huthsing.[6]



### 3. Joshua Glen Taylor

Joshua Glen Taylor was a supplier and redistributor of large quantities of methamphetamine in the District of Columbia. Evidence shows that he supplied narcotics to other members of the conspiracy and engaged in coordinated shipments and financial transactions. Financial records reflect hundreds of thousands of dollars in transactions consistent with narcotics

---

[6] Huthsing's notes, seen below, also indicate debts paid to his co-conspirators for which he was apparently responsible or otherwise interested in tracking. For example, in the November 18, 2025, daily ledger, Huthsing notes an $800 payment made by "El Patron" to "JT," which is the nickname by which Taylor is known.

trafficking. Communications and records further demonstrate Taylor's involvement in coordinating shipments, tracking quantities, and maintaining ongoing supply relationships within the conspiracy.

On October 8, 2025, United States Magistrate Judge for the District of Columbia Moxila Upadhyaya issued a search warrant authorizing the extraction of Defendant #6's seized phone. A review of the device extraction revealed numerous screenshots saved in the phone showing communications with multiple individuals regarding narcotics shipments and payments. Among these communications were messages with defendant Joshua Taylor, who goes by the nickname "JT," and who used telephone number ending in 7095.

In communications occurring on September 10, 2024, Taylor advises Defendant #6 that he has a couple of pounds of methamphetamine from Los Angeles that he could provide to Defendant #6 in Philadelphia. Taylor told Defendant #6 that the rest of the methamphetamine once Taylor sends payment to his supplier in a few days. Taylor states, "I have a couple of pounds [of] the newest stuff from LA that I can leave for you in Philly if you aren't there." Taylor went on to say that he has "the funds ready to ship off but didn't make it to the FedEx place today so he won't get them till Thursday and will get them out Friday for Saturday or Monday delivery." Taylor continues, "I'm sorry. But like I said I have a few pounds I can leave for you if you need them for the people from NZ to try and the rest will be here asap after I get the shipment out tomorrow." Days later, Defendant #6 was arrested in a Baltimore hotel with approximately three pounds of methamphetamine and numerous other drugs.

In communications occurring on or about May 20, 2025, Defendant #6 received a text message from Taylor (in white), revealing the coordination of drug resupply and distribution between Taylor and Defendant #6 in Washington, D.C.



Specifically, Taylor sent a text message to Defendant #6 requesting a resupply of "stuff" for the same day. Taylor further indicated that incoming shipments from California were delayed ("Shipments are delayed more than expected from Cali… but likely it will be Friday before we get them"), and discussed coordinating interim supply, including obtaining quantities from a local source and referencing amounts of "2-3 lbs" (…"if you have a local connect I would take 2-3 Lbs. depending on price"). In this conspiracy, wholesale quantities of methamphetamine are generally sourced from California and are sold in pound quantities. These communications demonstrate Taylor's involvement in the acquisition and redistribution of pounds of methamphetamine within

the Washington, D.C. area and his ability to access alternative sources of supply when there is a delay in his regular supply. It also shows, more importantly, Taylor's level in the conspiracy where 2-3 pounds of methamphetamine will only be sufficient for a couple of days of sales. A single dose of methamphetamine is approximately .25 grams. Two pounds of methamphetamine results in almost 4,000 dosages of methamphetamine. (2.2 pounds equals 1 kilogram.) This is stark evidence of how prolific Taylor was in trafficking methamphetamine and the amount of methamphetamine Taylor was releasing into our neighborhoods.

In a second screenshot, Taylor (in white) replied to multiple messages Defendant #6 had sent.



In the above string of texted replies, Taylor answers various questions posed by Defendant #6 regarding an upcoming supply of methamphetamine and other controlled substances (Defendant #6 having asked, "I'll ask for Tusi[7] how much approx. did u want?" to which Taylor replied "Half ounce"). Taylor also responds to a question about tracking a drug shipment ("I haven't gotten tracking still. I just messaged him," in response to Defendant #6's question, "Hey did u see message on 5. Could u please confirm tracking and shipping…")

In another screenshot of a conversation that occurred at an unknown date and time between Taylor (in white) and Defendant #6 (in green), the two discuss payments owed for the narcotics.

---

[7] "Tusi" also known as "2c" or "pink cocaine," is a recreation drug that contains a mixture of different psychoactive substances. According to the DEA, ketamine, methamphetamine, and MDMA are the most common ingredients, although cocaine, Oxycodone, fentanyl, xylazine, and various other synthetic cathinones have been found as well. There are no standardized proportions or properties for the substances. Tusi itself is not currently scheduled under the CSA.



In this screenshot, Taylor's message ordering pressed Xanax pills can be seen above ("I need 50 xan," and "Actually, 100") to which Defendant #6 replies, "Kk could do 100 for 450," or 100 Xanax for the cost of approximately $450.00.

In addition to the above-described narcotics related communications, investigators identified communications demonstrating Taylor's use of aliases to conceal his identity. In additional communications extracted from Defendant #6's device, the individual identified as "JT"

provided multiple names, like the name "Michael Delaney," and several addresses utilized by him.[8] A screenshot of this communication is depicted below.



[8] Despite the false names, investigators ran queries for Taylor's -7095 number through law enforcement databases, which consistently associated the number with Taylor, a 44-year-old white male born on Taylor's birth date. For instance, these databases revealed that on August 18, 2025, a 44-year-old white male with Taylor's date of birth was involved in a motor vehicle accident in Washington, D.C. The driver of one of the vehicles, a black Infiniti CP with Pennsylvania registration "MBW5534," identified themselves as "Joshua Glen Taylor" to the responding officer and provided the -7095 phone number as their contact number. These queries also revealed that on September 18, 2025, the user of the -7095 phone number called the Washington, D.C. Metropolitan Police Department's Telephone Reporting Unit ("TRU" Call System) to report a theft. The caller identified himself as "Joshua Taylor" and provided the -7095 number as their contact number.

33

Additionally, on April 28, 2023, a subject later identified as Joshua Glen Taylor, with Taylor's date of birth, was arrested at Ronald Reagan International Airport by Transportation Authority Administration (TSA) officers after attempting to board a JetBlue flight from Washington, D.C. to Fort Lauderdale, Florida utilizing a forged Pennsylvania driver's license. Booking information for Taylor after the arrest listed Taylor's 7095 phone number.

On April 29, 2026, law enforcement executed a search warrant on Taylor's hotel room in at the Courtyard Marriott in Short Pump, Virginia, and arrested Taylor there pursuant to an arrest warrant in this case. Recovered from Taylor's hotel room was approximately a half pound of suspected methamphetamine and a half ounce of fentanyl.

In sum, the evidence establishes that each defendant played a distinct but interconnected role in a sophisticated drug trafficking organization responsible for distributing large quantities of high purity methamphetamine and GBL. The defendants coordinated shipments across the country, maintained stash locations, directed transactions, and moved substantial drug proceeds through layered financial systems. The scale of the narcotics, the repeated seizures of kilogram quantities, and the ongoing nature of the conduct demonstrate that this was a dangerous, organized, and persistent conspiracy posing a significant risk to the community.

## **ARGUMENT**

Pursuant to 18 U.S.C. § 3142(e)(3)(A), there exists a rebuttable presumption as to all the defendants that no conditions or combinations of conditions can effectively ensure the defendants' appearance in this case and otherwise protect the community. By itself, an indictment establishes probable cause and triggers the presumption. *See, e.g., Smith*, 79 F.3d at 1210 ("the indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community"). In light of the nature and circumstances of the

34

offenses charged, the weight of the evidence against the defendants, the defendants' history and characteristics, and the dangers to the community posed by the defendants' release, none of the defendants in this matter can overcome the presumption that they are a danger to the community and a risk of nonappearance. To the contrary, these factors establish that the presumption is correct.

### A.    The Nature and Circumstances of the Offense

The nature and circumstances of the charged offenses weigh in favor of detention for several reasons. The grand jury found probable cause to believe that all apprehended defendants were engaged in a lengthy and wide-reaching conspiracy to distribute (1) 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, (2) 50 grams or more of methamphetamine (actual), and (3) GBL. Methamphetamine and GBL are dangerous drugs that are devasting local communities, causing overdose deaths, and facilitating violence (both domestic and drug-rival related). Methamphetamine and GBL cause tens of thousands of deaths in our country every year and the combination of those drugs are even more devastating. As explained above, the defendants obtained, distributed, and redistributed kilogram quantities of these and many other drugs throughout the east coast, including the Washington, D.C. area.

The charges against the defendants expose them to serious periods of incarceration. Based on the narcotics conspiracy charge alone, every defendant faces up to life in prison under 21 U.S.C. § 841(b)(1)(A)). Finally, the fact that law enforcement found additional narcotics when executing its arrest and search warrants, and recovered additional evidence that is still being evaluated, makes the probability of a Superseding Indictment more likely in this case, which could subject the defendants to even higher penalties, increasing their risk of non-appearance. Moreover, based on the charged offenses, each of the above-named defendants faces a rebuttable presumption that no conditions or combinations thereof can effectively ensure the defendants' appearance in this case

35

and otherwise protect the community, pursuant to 18 U.S.C. § 3142(e)(3)(A).

**B. The Weight of the Evidence Against Each Defendant**

The second factor, weight of the evidence against the Defendants, is to be considered equally with the other three factors for the Court's consideration for pre-trial detention, as recently clarified by former-Chief Judge Howell. This factor is a "common-sense" consideration, for "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that a defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *United States v. Blackson*, 2023 WL 1778194, at *10 (D.D.C. Feb. 6, 2023) (Howell, C.J.), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).

The evidence against each defendant is extremely strong. As noted above, law enforcement has recovered large quantities of methamphetamine, GBL and other drugs from Kent, Huthsing and Taylor. This occurred both during the long-term investigation into this drug trafficking conspiracy, as well as during the execution of search warrants on April 29, 2026. Kent was caught with large quantities of methamphetamine on at least three separate occasions, two of which while he was on supervised release. Huthsing and Taylor had large quantities of methamphetamine when arrested and Huthsing had additional shipments of drugs intercepted by law enforcement before his arrest.

Aside from the sheer weight of the drugs tied to the defendants' conspiracies, each defendant was captured on numerous electronic communications, despite utilizing encrypted messaging platforms, discussing drug shipments and drug distribution. These electronic communications further establish the defendants' participation in a large conspiracy.

**C. The History and Characteristics of the Defendants**

The history and characteristics of the defendants also weigh in favor of detention. Based on each defendants' personal history and characteristics, the presumption that they are a risk of flight and danger to the community is correct.

### 1) Matthew Kent

According to the Pretrial Services Report (PSR), Kent has two convictions and a pending D.C. Superior Court case in which he was arrested and charged with trafficking in methamphetamine while armed with a firearm. While he was on release in that case, the defendant sold approximately 221 grams of methamphetamine (98 percent purity) to a CS on April 23, 2025. Also while on supervised release, Kent traveled to Philadelphia in July 2025 to acquire a supply of methamphetamine. He returned to D.C., met up briefly with co-conspirator Huthsing (presumably to supply Huthsing with part of his shipment), and immediately thereafter was intercepted by law enforcement at Union Station. Kent was in possession of approximately 400 grams of methamphetamine, with a purity of 97%.

All of this unlawful behavior occurred after he had been arrested in Anne Arundel County in March 2024 with 480 grams of methamphetamine. Defendant Kent is a recidivist with a history of serious and high-level drug offenses involving some of the most dangerous drugs in our community. Despite his arrests, contacts with police while possessing large quantities of methamphetamine, and being under court supervision, Kent's drug trafficking has gone unabated. This factor weighs in favor of detention.

### 2) Colton Huthsing

Huthsing has no formal criminal history, which when taken at face value, is the factor that weighs most strongly in favor of pre-trial release. Upon closer examination, however, this

argument is unavailing. Multiple members of this conspiracy have been charged with and/or been convicted of drug trafficking offenses prior to the instant indictment, the most recent of which being Dunlap, the individual who referred to Huthsing as "his boss."

Dunlap has been indicted in the District Court for the District of Columbia, was ordered detained by this Court, where he remains pending trial nearly three months after his arrest. Nevertheless, all evidence available to the Court indicates that Huthsing continued to traffic narcotics, despite numerous warnings of potential criminal ramifications. Huthsing's history and characteristics should provide the Court with absolutely no comfort that it can fashion conditions of release that would ensure his compliance pre-trial. Through Huthsing's own conduct, he has demonstrated that there is only one way to stop his trafficking: his arrest and detention.

### 3) Joshua Taylor

Taylor has been a long-time supplier of methamphetamine, but lacks a formal criminal history. He uses numerous aliases and addresses to disguise his identity. He has already been charged with using a forged driver's license in an attempt to board a U.S. airplane. He has continued to traffic in narcotics despite the arrests of other co-conspirators. This factor weighs in favor of detention.

### D. The Nature and Seriousness of the Danger to Any Person or the Community Posed by the Person's Release

The fourth factor—the nature and seriousness of the danger to any person or the community posed by the person's release—also weighs in favor of detention. The presumption under § 3142(e)(3)(A), establishes that narcotics trafficking remains an "inherently dangerous activity." *See United States v. Bethea*, 763 F. Supp. 2d. 50, 54 (D.D.C. 2011) (Lamberth, C.J.).

Each defendant's release poses a physical danger to the community. Here, the defendants have been charged a sprawling drug trafficking conspiracy involving some of the most dangerous

38

and debilitating drugs that are having a horrifying impact on our local and national community. Under the Bail Reform Act, 18 U.S.C. §§ 3142 et seq., "[t]he statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985). Its legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger to the community." *Id.* at 507. As noted by the D.C. Circuit, Congress included the rebuttable presumption covering serious drug trafficking offenses because:

> 'Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism. Furthermore, the Committee received testimony that flight to avoid prosecution is particularly high among persons charged with major drug offenses. Because of the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country, these persons have both the resources and the foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences.'

*Alatishe*, 768 F.2d at 370 n.13 (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203). In creating a presumption of pretrial detention for serious drug trafficking offenses, both the legislative history and the statutory language make clear that very "real-world" concerns lie behind the recognition of the inherent, pretrial dangers and flight risks posed by those who commit serious drug trafficking offenses.

The discovery of additional drugs during the execution of search warrants and the continued unlawful behavior despite contacts with the criminal justice system strengthens this argument. Defendants' conduct has been ongoing and, as with many serious drug conspiracies, is backed by the threat of violence. Each defendant's release would pose a serious danger to the community.

## CONCLUSION

For the reasons noted above, the government respectfully submits that clear and convincing evidence establishes that there are no conditions or combinations of conditions that will reasonably assure the safety of any other person and the community. The government also submits that a preponderance of the evidence establishes that each defendant is a serious risk of flight and no conditions or combinations of conditions will assure their appearance in Court. Accordingly, the government respectfully requests that the Court grant the government's motion to detain each defendant pending trial in this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

*/s/ George P. Eliopoulos*
GEORGE P. ELIOPOULOS
MATTHEW W. KINSKEY
SOLOMON S. EPPEL
Assistant United States Attorneys
D.C. Bar No. 390601 (Eliopoulos)
D.C. Bar No. 1031975 (Kinskey)
D.C. Bar No. 1046323 (Eppel)
United States Attorney's Office
Violent Crime & Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530